IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
January 21, 2015 Session

**STATE OF TENNESSEE v. LONNIE LEE ANGEL, JR.**

**Appeal from the Circuit Court for Bledsoe County**
**No. 2009-CR-10     Thomas Graham, Judge**

---

**No. E2014-00732-CCA-R3-CD - Filed May 18, 2015**

---

The defendant, Lonnie Lee Angel, Jr., appeals his Bledsoe County Circuit Court jury conviction of second degree murder and the accompanying 23-year sentence, claiming that the trial court committed plain error by commenting on the testimony of a child witness, that the evidence was insufficient to support his conviction, that the trial court erred by providing jury instructions on flight and on second degree murder as a lesser included offense of first degree murder, and that the trial court erred by applying two enhancement factors. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Elizabeth G. Adams, Dayton, Tennessee (on appeal); and James C. Smith, Jr., Rockwood, Tennessee (at trial), for the appellant, Lonnie Lee Angel, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; J. Michael Taylor, District Attorney General; and James W. Pope, III, and Steven Strain, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The conviction in this case arose from the beating death of the victim, Donnie L. Lawson, in February 2009.

On February 21, 2009, the defendant hosted a cookout inside the barn at his residence in Bledsoe County. The victim came to the cookout with the defendant's father,

Lonnie Lee Angel, Sr., who passed out in his truck shortly after arriving at the fete due to his having consumed a significant amount of alcohol and several prescription medications. At some point, an argument erupted over the details of the death of Clyde Angel, the defendant's uncle who had died in a house fire. One of the attendees, Preston Parker, who was a "fourth cousin or something" to the defendant, became so enraged when the victim implied that he might have had a hand in Clyde Angel's death that he "grabbed [the victim], and jerked him down, and . . . hit him . . . as he went down, and . . . kicked him a few times" in the head as he lay on the ground. Because he believed the victim to be "a pretty rough feller" who had "whooped two or three, shot one or two," Mr. Parker struck the victim again as the victim attempted to regain his feet.

Following this initial beating of the victim, the six-foot-seven-inch, 350-pound defendant declared that no one would be permitted to leave the residence. Mr. Parker ordered the four children who were present, Mr. Parker's nephew and son and the defendant's sons, back to the defendant's mobile home.

After approximately 15 minutes, the defendant allowed Virgil "Tiny" Eller to leave after Mr. Eller convinced the defendant that he needed to pick up his girlfriend. Shortly thereafter, Ray Tullos and Mark Sherman arrived, and Mr. Parker relayed to the men "what went on." Mr. Tullos, indignant at the victim's implication regarding the death of Clyde Angel, attacked the unconscious victim, striking him with a "big beer bottle," "a pair of boots," and a post driver. Later, Mr. Tullos boasted to Mr. Parker that he had urinated on the victim. Mr. Sherman recalled that when he and Mr. Tullos arrived, the victim lay on the ground, unconscious and bleeding from several wounds on his face. Mr. Sherman told the defendant that the victim needed medical attention, and the defendant responded, "Preston, that's enough. The man's in a coma now."

Following the savage attack, the men began to discuss what should be done with the victim, and one of the men suggested "[h]auling [the victim] off to the rock crusher" while the defendant aimed a gun at the victim and threatened to shoot him. Before any action could be taken, Mr. Angel, Sr., awoke and demanded to know what had transpired. Mr. Angel, Sr., told the men that the victim had played no role in Clyde Angel's death and ordered the men to leave the victim alone. Mr. Angel, Sr., asked to leave, and although he had initially refused to allow anyone to leave, the defendant eventually asked Mr. Sherman to drive Mr. Angel, Sr., home.

Both Mr. Parker and his 12-year-old nephew, D.P.,[1] testified that the defendant struck or kicked the victim more than one time. Mr. Parker and D.P. each testified that the

[1]We identify the minor witnesses by their initials.

defendant aimed a gun at the victim and threatened to kill him. Mr. Sherman testified that another attendee, Allen Watson, rather than the defendant, threatened to shoot the victim. P.J.P., Mr. Parker's son, testified that he did not see the defendant hit or strike the victim.

Mr. Angel, Sr., telephoned 9-1-1 at 9:30 p.m. and asked that an ambulance be sent to the defendant's residence because the victim had been beaten "to death."

When the ambulance arrived, the victim was barely alive. The victim was "unresponsive" and "[b]arely breathing." His face was swollen and covered in dried blood, and his eyes were "swollen shut." He had a "[l]arge knot on the backside of his head where it appeared he was hit with something" and "a lot of bruising on his chest and on his side." Weather conditions thwarted attempts to arrange air transport for the victim, and the victim was transported by ambulance to the hospital, where he was pronounced dead at 11:00 p.m.

An autopsy established that the victim had died as a result of multiple blunt force injuries to his head. The victim suffered multiple head injuries, including a number of abrasions and lacerations, two black eyes, and a broken jaw. The victim also suffered bleeding beneath his scalp and around his brain. As a result of the multiple blunt force injuries inflicted on his head, the victim's brain swelled, putting pressure on the "vital structures of the brain that control" breathing and heart rate, which eventually led to the victim's death.

Forensic testing confirmed the presence of the victim's blood on a boot found in the bed of the defendant's truck, on a post driver found in the defendant's barn, on a beer bottle found in the defendant's barn, and on the legs of the defendant's blue jeans. Blood found on the front left pocket area of the defendant's blue jeans "was consistent with a DNA mixture" of the defendant and the victim. A short-sleeved gray t-shirt recovered from the defendant's house had two blood stains, one with a DNA profile that belonged to the victim and one that contained a mixture of DNA from the victim, the defendant, and an unknown minor contributor.

The trial court granted the defendant's motion for a judgment of acquittal on the counts charging the defendant with aggravated kidnapping and felony murder in the perpetration of kidnapping, and the jury acquitted the defendant of first degree premeditated murder but convicted him of the lesser included offense of second degree murder. Following a sentencing hearing, the trial court imposed a sentence of 23 years' incarceration.

The defendant filed a timely but unsuccessful motion for new trial,[2] followed by a timely notice of appeal. In this appeal, the defendant contends that the trial court committed plain error by improperly commenting on the testimony of P.J.P., that the evidence was insufficient to support a conviction of second degree murder, that the trial court erred by providing jury instructions on second degree murder as a lesser included offense of premeditated murder and flight, and that his sentence is excessive. We consider each claim in turn.

## I. Child Witness

The defendant first asserts that the trial court erred by commenting on the testimony of a child witness. Apparently acknowledging that he waived plenary consideration of this issue by failing to lodge a contemporaneous objection, the defendant argues that the trial court's admonishing courtroom spectators during P.J.P.'s testimony amounted to an improper comment on the witness's testimony and that the error can be classified as plain. The State contends that the trial court committed no error, averring that the court's admonishment was an attempt to prevent the coaching of the witness.

Before an error may be recognized as plain, it "must be 'plain' and it must affect a 'substantial right' of the accused." *State v. Adkisson*, 899 S.W.2d 626, 639 (Tenn. Crim. App. 1994). Authority to correct an otherwise "forfeited error" lies strictly "within the sound discretion of the court of appeals, and the court should not exercise that discretion unless the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *United States v. Olano*, 507 U.S. 725, 732 (1993) (citations omitted).

In *State v. Smith*, our supreme court adopted *Adkisson*'s five-factor test for determining whether an error should be recognized as plain:

> "(a) the record must clearly establish what occurred in the trial court;
>
> (b) a clear and unequivocal rule of law must have been breached;
>
> (c) a substantial right of the accused must have been adversely affected;
>
> (d) the accused did not waive the issue for tactical reasons; and

---

[2]The delay between the filing of the defendant's initial motion for new trial and the hearing on his motion appears to be attributable to changes in his counsel.

> (e) consideration of the error is 'necessary to do substantial justice.'"

*Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (quoting *Adkisson*, 899 S.W.2d at 641-42). "[A]ll five factors must be established by the record before this court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Smith*, 24 S.W.3d at 283.

During the State's cross-examination of P.J.P., the following exchange occurred:

> Q       All right.  And do you also remember talking to your mama and telling your mama that [the defendant] hit the man first with a shovel or something, do you remember that?
>
> A       No, sir.
>
> Q       You don't remember telling your mama that.  Okay.  But all the people – who are the ones that you remember being inside the barn when this started –
>
> THE COURT:  Wait just a minute.  Let me say this.  I think his parents, or whoever that is back on the back, you all can't sit back there and shake your head.  If you can't control yourself you'll have to step outside the courtroom.  We just want him to answer as best he can remember, and that's all anybody's asking him to do.  Okay.

The defendant argues that the trial court's admonishment equated to an improper comment on P.J.P.'s testimony and that the error qualifies as plain.

The defendant's bid for plain error review fails because he did not demonstrate that a clear and unequivocal rule of law was breached.  Our state constitution forbids trial judges from commenting on the evidence in a case.  *See* Tenn. Const. art. VI, § 9 ("The Judges shall not charge juries with respect to matters of fact, but may state the testimony and declare the law.").  "In all cases the trial judge must be very careful not to give the jury any impression as to his feelings or to make any statement which might reflect upon the weight or credibility of evidence or which might sway the jury." *State v. Suttles*, 767 S.W.2d 403,

406-07 (Tenn. 1989). In our view, the trial court's admonition did not reflect upon the weight or credibility of P.J.P.'s testimony but was instead directed at courtroom spectators who were either reacting to his testimony or attempting to coach the child witness from the gallery. The court's comments were not directed to the jury or the witness and did not mention the testimony already given. In consequence, the defendant is not entitled to relief on this issue.

## II. Sufficiency

The defendant contends that the evidence was insufficient to support his conviction of second degree murder because the State failed to establish that he knowingly killed the victim. The State asserts that evidence showed that the defendant actively participated in beating the victim after he had been beaten into unconsciousness by Mr. Parker.

When an accused challenges the sufficiency of the evidence, the appellate court considers the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, *see* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979), regardless whether the conviction is based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence, *see State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011) ("[D]irect and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence."). Especially inimical to the defendant's claim is the well-rooted axiom that the appellate court neither re-weighs the evidence nor substitutes its inferences for those drawn by the trier of fact. *State v. Winters*, 137 S.W.3d 641, 655 (Tenn. Crim. App. 2003). Also, the credibility of the witnesses, the weight and value of the evidence, and all other factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Importantly, we afford the State of Tennessee the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case, second degree murder is the "knowing killing of another." T.C.A. § 39-13-210(a)(1). "A person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." T.C.A. § 39-11-401(a). Additionally, criminal responsibility for the actions of another arises when the defendant, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, . . . solicits, directs, aids, or attempts to aid another person to commit the offense." *Id.* § 39-11-402(2); *see State v. Lemacks*, 996 S.W.2d 166, 170

(Tenn. 1999) ("As reflected in this case, criminal responsibility is not a separate, distinct crime. It is solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person.").

In this case, the evidence adduced at trial, examined in the light most favorable to the State, established that Mr. Parker attacked the victim after the victim intimated that he may have had a hand in the death of Clyde Angel, a relative of both the defendant and Mr. Parker. The defendant and Mr. Parker were both angered by the victim's suggestion that he had played a role in the death of Clyde Angel. Mr. Parker beat the victim into unconsciousness. Over the next few hours, the defendant, Mr. Parker, Mr. Watson, and Mr. Tullos, all of whom had been drinking, struck and kicked the victim while he lay unconscious and bleeding on the floor of the defendant's barn. Mr. Parker testified that the defendant kicked the victim "once or twice," discussed "[h]auling [the victim] off to the rock crusher," and "had a pistol out [and] was going to shoot [the victim]." D.P. testified that the defendant kicked the victim and hit him "with the bottle and the boots." D.P. also testified that the defendant aimed a gun at the victim and "said he was going to kill him and put him in the rock crusher." For at least some period of time, the defendant refused to allow anyone to leave the barn, indicating that he had some measure of control over the men. Mr. Sherman testified that during the attack, he told the defendant, "Lonnie, the man needs an ambulance," and the defendant responded by shouting at Mr. Parker, "Preston, that's enough. The man's in a coma now." This evidence showed that the defendant, who towered over the other men, was able to, at least briefly, forestall the attack on the victim and that he, despite being aware of the gravity of the victim's condition, rejected the invitation to obtain medical treatment for the victim. The photographs attest to the savagery of the victim's murder. Evidence that the defendant struck and kicked the victim, that the defendant threatened the victim's life, that the defendant apparently exercised a degree of control over the situation, and that he refused medical treatment to the victim, particularly in light of the brutality of the attack and the victim's obvious distress, clearly established that the defendant acted with the intent to promote or assist in the knowing killing of the victim. Thus, the evidence was sufficient to support the defendant's conviction of second degree murder.

### III. Jury Instructions

The defendant next asserts that the trial court erred by providing a jury instruction on second degree murder as a lesser included offense of first degree murder because the evidence did not support the giving of the instruction. The defendant also argues that the trial court erred by providing a jury instruction on flight The State argues that the jury instructions were appropriate.

An accused's constitutional right to trial by jury, *see* U.S. Const. amend VI;

-7-

Tenn. Const. art. I, § 6, encompasses a right to a correct and complete charge of the law, *see State v. Teel*, 793 S.W.2d 236, 249 (Tenn. 1990). The trial court has a duty "to give a complete charge of the law applicable to the facts of a case." *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986); *see Teel*, 793 S.W.2d at 249; *see also* Tenn. R. Crim. P. 30.

The legal accuracy of the trial court's instructions is a question of law subject to de novo review. *See Troup v. Fischer Steel Corp.*, 236 S.W.3d 143, 149 (Tenn. 2007). The propriety of a given instruction is a mixed question of law and fact to be reviewed de novo with a presumption of correctness. *Carpenter v. State*, 126 S.W.3d 879, 892 (Tenn. 2004); *State v. Smiley*, 38 S.W.3d 521, 524 (Tenn. 2001).

## *A. Second Degree Murder*

Tennessee Code Annotated section 40-18-110 provides that "the trial judge shall instruct the jury as to the law of each offense specifically identified in the request that is a lesser included offense of the offense charged in the indictment or presentment." T.C.A. § 40-18-110(a) (2006). "Second degree murder is a lesser included offense of first degree murder as defined in § 39-13-202." *Id.* § 40-18-110(g)(1).

Before providing an instruction on a lesser included offense, however, the trial court must determine whether "the record contains any evidence which reasonable minds could accept as to the lesser included offense." *Id.* The trial court must make this determination by viewing "the evidence liberally in the light most favorable to the existence of the lesser included offense without making any judgment on the credibility of evidence" and must "also determine whether the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser included offense." *Id.* "The trial court must provide an instruction on a lesser-included offense supported by the evidence even if such instruction is not consistent with the theory of the State or of the defense. The evidence, not the theories of the parties, controls whether an instruction is required." *State v. Allen*, 69 S.W.3d 181, 187-88 (Tenn. 2002). As a result, "the decision to convict on a lesser-included offense" should not "be taken away from the jury" merely because "the element distinguishing the greater offense from the lesser offense is uncontroverted." *Id.* at 189. This standard of review best preserves the jury's role as fact finder. *See id.* (citing Tenn. Const. art. I, § 19 for the proposition that "'the jury shall have a right to determine the law and the facts'").

Initially, we note that the defendant did not object at trial to the instruction on second degree murder as a lesser included offense of first degree premeditated murder. His failure to object bars his claim for relief on appeal. Code section 40-18-110 provides:

Prior to instructing the jury on the law, the trial judge shall give

-8-

the parties an opportunity to object to the proposed lesser included offense instructions. *If the defendant fails to object to a lesser included offense instruction, the inclusion of that lesser included offense instruction may not be presented as a ground for relief either in a motion for a new trial or on appeal.*

T.C.A. § 40-18-110(d) (emphasis added).

Moreover, as discussed more fully above, the evidence adduced at trial supported a finding of a knowing killing. The circumstances of the victim's death by repeated, vicious blows over a period of hours while the victim lay defenseless easily justified an instruction on second degree murder as a lesser included offense of first degree murder as charged in this case.

## B. Flight

To properly charge the jury on flight as an inference of guilt, there must be sufficient evidence to support such instruction. *State v. Berry*, 141 S.W.3d 549, 588 (Tenn. 2004). Sufficient evidence supporting such instruction requires "'both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community.'" *State v. Payton*, 782 S.W.2d 490, 498 (Tenn. Crim. App. 1989) (quoting *Rogers v. State*, 455 S.W.2d 182, 187 (Tenn. Crim. App. 1970)). Our supreme court has held that "[a] flight instruction is not prohibited when there are multiple motives for flight" and that "[a] defendant's specific intent for fleeing a scene is a jury question." *Berry*, 141 S.W.3d at 589.

The State asked for a flight instruction based upon the defendant's failure to turn himself in to authorities after learning that there was a warrant for his arrest. In our view, the evidence in this case did not support the giving of the flight instruction. The defendant did not flee the scene of the murder and was present when the police and emergency personnel arrived. Some evidence suggested that the defendant went to the hospital to check on the victim. Although the defendant was not at his residence when officers executed a search warrant on February 22, 2009, no proof showed that he had intentionally absented himself from his residence or that he was hiding from the police. Indeed, the defendant telephoned Tennessee Bureau of Investigation Agent Mark Wilson on February 23, 2009, after learning of the warrant for his arrest and agreed to turn himself in after securing childcare for his children. The defendant said he would surrender between 9:30 p.m. and 10:00 p.m. that same evening. He was then arrested at his sister's residence at 9:45 p.m.

That being said, the erroneous giving of the flight instruction did not impact

the outcome of this case and, in consequence, was harmless. *See, e.g., State v. Smith*, 893 S.W.2d 908, 918 (Tenn. 1994) (noting that "any error as to the flight instruction" was harmless given the "overwhelming proof of [Smith's] guilt); *State v. Paul Wallace Dinwiddie*, No. E2009-01752-CCA-R3-CD, slip op. at 13-14 (Tenn. Crim. App., Knoxville, July 23, 2010) (noting that the erroneous giving of the flight instruction is "subject to a traditional harmless error analysis").

*IV.  Sentencing*

Finally, the defendant claims that the trial court misapplied two enhancement factors and asks this court to "reduce his sentence accordingly." The State contends that the 23-year sentence imposed in this case was appropriate.

Our standard of review of the trial court's sentencing determinations in this case is whether the trial court abused its discretion, but we apply a "presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012).  The application of the purposes and principles of sentencing involves a consideration of "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed."  T.C.A. § 40-35-103(5).  Trial courts are "required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise*, 380 S.W.3d at 706 n.41 (citing T.C.A. § 40-35-210(e)).  Under the holding in *Bise*, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709.

We need not belabor the defendant's claim because, even assuming that the trial court misapplied the challenged enhancement factors, "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706.  Nothing in the record suggests that the trial court in this case "wholly departed from" the Sentencing Act.  To the contrary, the record reflects that the trial court considered all the relevant principles associated with sentencing, including the enhancement and mitigating factors, when imposing the sentence in this case.

*Conclusion*

Based upon the foregoing analysis, we affirm the judgment of the trial court.

-10-

_____
JAMES CURWOOD WITT, JR., JUDGE